

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00229-CR

_____


CEDRIC CHARLES CLAY, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2010F00089



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

# OPINION

Cedric Charles Clay was tried to a Cass County jury and convicted of two counts of sexual assault and one count of engaging in organized criminal activity.[1] Clay was sentenced to a term of life imprisonment and a $10,000.00 fine on each of the three counts.[2]

On appeal, Clay contends that: (1) the evidence supporting his conviction for engaging in organized criminal activity was legally insufficient; (2) the trial court improperly limited voir dire of the jury panel regarding the parameters of proof beyond a reasonable doubt; (3) the trial court improperly limited his cross-examination of an alleged victim; (4) the trial court improperly excluded a portion of a defense witness' testimony; and (5) the County Court at Law judge erred by failing to grant a continuance after the presiding judge became ill.

We affirm the trial court's judgment.

## I. Factual Background

On or about January 28, 2010, in Atlanta, Texas, Wilton Haynes drove Clay and Gregory Young to an apartment complex where he picked up three teen-aged girls, Amy, Sherry, and Marie.[3] Sherry and Marie alleged that they were subsequently driven to several different houses,

---

[1]In trial court cause number 2010F00089, Clay was indicted on five counts of sexual assault (counts 1–5), one count of engaging in organized criminal activity (count 6) and one count of aggravated sexual assault of a child (count 7). He was convicted on counts 1, 2, and 6. Clay was found "not guilty" of the remaining counts of sexual assault and aggravated sexual assault. All of the counts listed in trial court cause number 2010F00089 relate only to one alleged victim, Marie. All charges related to a second alleged victim, Sherry, were made in trial court cause number 2010F00090, and they stem from the same facts as, and were tried simultaneously with, the charges of trial court cause number 2010F00089. Clay's appeal from trial court cause number 2010F00090 is addressed in our opinion in cause number 06-11-00230-CR.

[2]The range of punishment was enhanced due to Clay's prior offenses.

[3]As the three girls are minors, we have used pseudonyms for their protection.

2

where they were sexually assaulted and forced to ingest cocaine. A few days later, Marie made an outcry to her parents, and after an investigation, these charges were filed.

The three girls[4] were at a friend's home at the Holly Hills Apartments in Atlanta, Texas. They left the apartments and were picked up by Haynes (a/k/a Butch). Clay (a/k/a C.B.) and Young (a/k/a Solo) were also in Haynes' car. Neither Marie nor Sherry knew the men in the car.

Haynes drove them all to the home of Carl James (a/k/a Peanut). James was an admitted drug user who preferred crack cocaine. James testified that he and his girlfriend had been drinking beer and ingesting crack cocaine before Young and Clay arrived at the house. James' written statement indicated that Clay and Young arrived with Amy and two white girls, but he testified that the two men arrived with only "two white girls."[5] He testified that he did not see anyone else using drugs, but his prior statement indicated Clay and those with him were snorting cocaine. Young gave him a twenty dollar rock of crack cocaine in exchange for letting them "use the room." James said that Young went into the bedroom with two girls, but he did not see any sexual activity or guns. Young and Clay provided him with drugs in exchange for the use of the bedroom.

At James' house, Sherry, Marie, Amy, Young, and Clay went into the back bedroom. Marie testified that Clay had a black handgun "[o]n his side" and threatened to kill her if she ever told anyone about this. While all of them were in the bedroom, Marie also saw a gun on the table next to Young. Both Sherry and Marie claim that Clay forced them to inhale several lines

[4]At the time, Amy and Marie were each fourteen years old and Sherry was fifteen years old; the girls considered each other to be best friends.

[5]If there was also a black female with them, James did not remember her.

3

of cocaine, and Marie remembered seeing Young look at a gun on the table like he was "going to do something with it if we" refused.

Everyone left the bedroom except for Sherry and Young. Sherry testified that Young sexually assaulted her. She remembers Clay and Young threatening that if the girls told anyone, they (Clay and Young) would shoot them (the girls) and their families. Sherry testified that she saw a gun in a corner with a sheet over it and a handgun on a table.

Marie testified that while Young and Sherry were in the bedroom, Clay brought out some cocaine and she, Clay, and Amy inhaled several more lines. Marie testified that Clay directed her to the laundry room, where he sexually assaulted her. She "told him no and he kept going" and he told her "[n]ot to tell [Amy]."

After Sherry and Young left the bedroom, Clay pulled Marie into the bedroom and sexually assaulted her again. She told him to get off of her, but Clay put his gun close to her head. Clay left the bedroom, and Young entered the room and sexually assaulted Marie.

Clay had taken Sherry and Amy outside, where another car was waiting. There is disputed testimony regarding whether Amy, Sherry, or both girls went back into the house to get Marie. Sherry testified that she went back in to get Marie and she saw Young and Marie in the bedroom and Marie had her pants and panties off. Amy testified that when she went back in to get Marie, she saw Marie and Young in the bedroom. Amy saw that Marie had her shirt off, but her pants and bra on, and Young had only his underwear on. Marie testified that Sherry came back into the bedroom and saw her with her pants off and Young clothed only from the waist up.

4

Outside the house, the other two girls and Clay were waiting in Corvell Anderson's car when Marie joined them. Anderson drove them to the home of Tony Hill (a/k/a Thriller). Sherry and Amy went to the living room, while Marie and Clay went to the bedroom. At Hill's house, Marie testified that Clay sexually assaulted her, that she had to perform oral sex on Hill, and that Anderson also sexually assaulted her.

While they were all at Hill's house, Amy remembered Clay saying that Marie "wanted to trick, she wanted to make some money" and "she didn't want [her] to think nothing different of her." Amy and Sherry stayed at Hill's house while Marie, Clay, and Anderson got back into Anderson's car and drove Marie to several other houses, where, Marie testified that several different men paid Clay and then sexually assaulted her before Clay and Anderson picked her up and took her to another house. In between these trips, Marie was taken back to Hill's house a couple of times, where she was sexually assaulted by Clay, Hill, and Anderson, as well as made to use more cocaine. Hill confirmed that he had sex with Marie during one of her return trips to his house.

Young was at one of the houses where Anderson and Clay had driven Marie. Marie testified that Young took her into a bedroom and sexually assaulted her. While at that house, two unidentified men also sexually assaulted her.

Sherry confirmed that she was at Hill's house for a couple of hours. She and Amy remembered Clay and Anderson leaving with Marie a couple of times.

After Marie was brought back to Hill's house for the second (and last) time, Anderson saw that the other two girls were asleep on the couch. Anderson said Clay talked to Marie for a

few minutes, then he (Anderson) went into the back room with Marie and had sex with her. After having sex with Marie, Anderson woke up Sherry and Amy and drove all three girls to a place on Main Street, called Dixie Maid, where the girls told him to stop, and they walked back to Marie's home. Amy testified that during the walk, Marie was not upset and that she was in a good mood.

Anderson confirmed that he snorted cocaine a few times that night and that he had oral sex and vaginal sex with Marie at Hill's house. He said Marie voluntarily disrobed for him and asked him what he wanted to do. Anderson also confirmed that he drove Clay and Marie to three houses that night (including Hill's). In exchange for the driving he did that night, Clay provided Anderson with cocaine.

Clay was found guilty of sexual assault of a child, engaging in organized criminal activity and aggravated sexual assault and sentenced to life in prison on each count.

## II. Legal Sufficiency of the Evidence

In his first point of error, Clay argues that there is legally insufficient evidence to support the jury's verdict that he engaged in organized criminal activity.

In evaluating legal sufficiency, we review all of the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of engaging in organized criminal activity beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal

6

sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

To secure a conviction for engaging in organized crime, the State had to prove that Clay: (1) with intent to establish, maintain, or participate in a combination or in the profits of a combination (2) committed or conspired to commit aggravated sexual assault. TEX. PENAL CODE ANN. § 71.02(a)(1) (West Supp. 2012); *Munoz v. State*, 29 S.W.3d 205, 208 (Tex. App.—Amarillo 2000, no pet.); *see Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988).

Intent and knowledge are fact questions for the jury and are almost always proven through circumstantial evidence. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). A jury may infer intent from any facts that tend to prove the combination's existence, including the defendant's words, acts, and conduct, and the method of committing the enumerated offense.

7

*Arredondo v. State*, 270 S.W.3d 676, 682 (Tex. App.—Eastland 2008, no pet.) (citing *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002)).

A combination means three or more persons who collaborate in criminal activities, even though the participants may not know the others' identities, the membership may change from time to time, and the participants may stand in a wholesale-retailer or other arm's-length relationship in illicit distribution operations. *See* TEX. PENAL CODE ANN. § 71.01(a) (West 2011). "Conspires to commit" means "that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement." TEX. PENAL CODE ANN. § 71.01(b) (West 2011). "It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal." *Arredondo*, 270 S.W.3d at 682. However, proof of a single, ad hoc, effort is insufficient. *Id.* "Profits" consist of any "property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in Section 71.02," such as aggravated sexual assault. TEX. PENAL CODE ANN. § 71.01(c) (West 2011).

The offense of engaging in organized criminal activity requires that "the actor must not only agree to participate but must himself perform some overt act in pursuance of that agreement." *Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988); *Pardue v. State*, 252 S.W.3d 690 (Tex. App.—Texarkana 2008, no pet.); *State v. Mauldin*, 63 S.W.3d 485, 487 (Tex. App.—Tyler 2001, pet. ref'd). The overt act, though, "need not be criminal in itself[,]" and "acts that suffice for party liability—those that encourage, solicit, direct, aid, or attempt to aid the

8

commission of the underlying offense—would also satisfy the overt act element of section 71.02." *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003) (footnote omitted); *In re L.A.S.*, 135 S.W.3d 909, 919 (Tex. App.—Fort Worth 2004, no pet.).

The indictment alleges that Clay, Hill, and Anderson collaborated and conspired to commit aggravated sexual assault of Marie, and Hill and Anderson performed an overt act in pursuance of their agreement by utilizing a bedroom in Hill's home for the purpose of sexually assaulting Marie. Clay argues that there is no evidence of Clay, Hill, and/or Anderson forming an agreement or making a plan and that Anderson did not join an organized crime because one did not exist at the time Anderson became involved. Clay contends that neither Anderson nor Hill committed an overt act in furtherance of a conspiracy by utilizing a bedroom in Hill's house.

Here, it is undisputed that Anderson picked up Clay and the girls and drove them to Hill's house. Clay gave Anderson some drugs in exchange from driving them around. When Clay entered the house, he identified the girls as number one, number two, and number three. Hill testified that when he, Clay, and Marie were alone in the bedroom, Marie was undressed and Clay asked him how he liked her, referring to Marie, and Hill responded, "She's okay." While at Hill's house, Hill admitted to touching Marie "in her vaginal area" with his hand, and he also admitted having sex with her later in the night. Anderson testified that he also had sex with Marie. Marie testified that Clay, Hill, and Anderson each sexually assaulted her more than once at Hill's house. Multiple witnesses testified that the girls were inhaling cocaine throughout the night, and Hill testified that he, Clay, and Anderson purchased additional cocaine that was given to the girls that night.

9

Even though there is no testimony describing a meeting between Clay, Hill, and Anderson where they agreed upon a common plan, such an agreement may be inferred in this case from the words and acts of the parties. *See* TEX. PENAL CODE ANN. § 71.01(b). Viewing the evidence in the light most favorable to the jury's verdict, we find that there is sufficient evidence from which a rational jury could find the elements of organized criminal activity beyond a reasonable doubt. Therefore, we overrule this point of error.

## III. Limitation of Voir Dire Examination of Jury Panel

In his second point of error, Clay contends that the trial court erred by preventing him from voir diring the jury panel on the parameters of proof beyond a reasonable doubt.

The trial court has broad discretion over the process of selecting a jury. *Sells v. State*, 121 S.W.3d 748, 755 (Tex. Crim. App. 2003). We leave to the trial court's discretion the propriety of a particular question and will not disturb the trial court's decision absent an abuse of discretion. *Id*. A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id*. at 755–56. "A question is proper if it seeks to discover a juror's views on an issue applicable to the case." *Id*. at 755. "However, an otherwise proper question is impermissible if the question attempts to commit the juror to a particular verdict based on particular facts." *Id*. "In addition, a trial judge may prohibit as improper a voir dire question that is so vague or broad in nature as to constitute a global fishing expedition." *Id*.

The following exchange took place during Clay's portion of voir dire:

> [CLAY'S COUNSEL:] . . . The state of Texas, and the state of Texas alone, through its prosecutors, has the sole burden of proof, to prove their case beyond a reasonable doubt. Now, Mr. Allen is correct when he told you that that is not beyond all doubt, but that is beyond a reasonable doubt. Now, there is no

precise definition of reasonable doubt that the court will give you. In my forty years of experience in practicing law, in criminal cases, I would suggest to you that a good, non-legal definition of reasonable doubt is the following, and I want to see if you agree with me. Proof beyond a reasonable doubt is the certain --.

MR. ALLEN: Your Honor, I'm going to object. May we approach the Bench?

THE COURT: Yes, sir.

(At the Bench, outside the hearing of the venire panel)

THE COURT: Yes, sir?

MR. ALLEN: Judge, my understanding is that any attempt to define beyond a reasonable doubt is improper under the laws that currently exist.

MR. MAYBEN: Judge, I -- it's just a layman's terms. It's not a big legalese term.

THE COURT: Well, I'm going to sustain the objection. If it's not a legal term, then it would be irrelevant. The law allows each juror to determine in their own mind what's a reasonable doubt, so I'm going to sustain the objection.

In support of his contention that the trial court erred, Clay relies on *Fuller v. State*, where immediately before voir dire commenced at the capital murder trial, the defendant asked that he be permitted to ask members of the venire panel whether they understood that the standard of proof beyond a reasonable doubt constituted a level of confidence under the law that was higher than both the preponderance of the evidence and clear and convincing standards. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012). The trial court refused to allow the questions, finding that *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000), disallowed such voir dire examination. *Fuller*, 363 S.W.3d at 587. The Texas Court of Criminal Appeals noted that its

11

opinion in *Paulson*, held "that the better practice is to give no definition of reasonable doubt at all to the jury." *Id.* at 586. The court stated:

> [I]nquiry into a prospective juror's understanding of what proof beyond a reasonable doubt means constitutes a proper question regardless of whether the law specifically defines that term. The jury's ability to apply the correct standard of proof remains an issue in every criminal case. If anything, the fact that current case law has come full circle and once again provides jurors with no definition of reasonable doubt only heightens the incentive for the parties to test the understanding of the veniremembers. And it strikes us as particularly apt to inquire whether a prospective juror understands that proof beyond a reasonable doubt must at least constitute a more onerous standard of proof than preponderance of the evidence and clear and convincing evidence. It is but the flip side of the inquiry that prosecutors engage in routinely during voir dire, designed to test whether prospective jurors will hold the State to the inappropriately onerous standard of proof beyond all doubt. While neither area of inquiry purports to assign a precise meaning to the term "reasonable doubt"— leaving that for the jurors themselves to supply, according to their own common-sense understanding of the words—they do serve to set the lawful parameters of reasonable doubt and thereby foster the selection of jurors who will not impose a standard of proof upon the State that they know for sure to be either too lenient (preponderance or even clear and convincing) or too burdensome (all doubt).

*Id.* at 587 (footnotes omitted). The *Fuller* court held that the trial court abused its discretion because it was appropriate for the defendant to explain the contrast among the various standards of proof in the case, and the defendant clearly proffered a question that was at least relevant to, if not altogether dispositive of, a legitimate defensive challenge for cause. *Id.* at 589.

In *Fuller*, the defendant tried to question the panel regarding the contrast between the standards of proof, whereas here, Clay sought not to question the jury regarding the standard of proof, but to establish his own "good, non-legal definition" of the reasonable doubt standard and then see if the panel agreed with his definition. *Id.* at 589. We find that the trial court was

12

within its discretion to limit Clay's voir dire of the panel because Clay's personal definition of reasonable doubt is irrelevant and an improper area of inquiry. We overrule this point of error.

## IV. Limitation of Cross-Examination

In his third point of error, Clay argues that the trial court improperly denied him the right to cross-examine Marie "regarding her plan to deceive her parents as to where she would be on the night in question."

The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying. U.S. CONST. amend. VI; *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). This right is not unqualified, however; the trial judge has wide discretion in limiting the scope and extent of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000); *Castle v. State*, 748 S.W.2d 230, 233 (Tex. Crim. App. 1988). Generally, the right to present evidence and to cross-examine witnesses under the Sixth Amendment does not conflict with the corresponding rights under state evidentiary rules. *Potier v. State*, 68 S.W.3d 657, 660–65 (Tex. Crim. App. 2002). Thus, most questions concerning cross-examination may be resolved by looking to the Texas Rules of Evidence. *Hammer*, 296 S.W.3d at 561. In those rare situations in which the applicable rule of evidence conflicts with a federal constitutional right, Rule 101(c) of the Texas Rules of Evidence requires that the United States Constitution controls over the evidentiary rule. Rule 101(c) also states, "Where possible, inconsistency is to be removed by reasonable construction" as well as by reasonable application

13

of the rule. Thus, compliance with the reasonable construction and application of a rule of evidence will, in most instances, avoid a constitutional question. *Id.*

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Calloway v. State*, 743 S.W.2d 645, 651–52 (Tex. Crim. App. 1988). This is so because trial courts are usually in the best position to make the call on whether certain evidence should be admitted or excluded. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

During Clay's cross-examination of Marie, the following exchange took place:

> Q      [BY CLAY'S COUNSEL] Okay. And I believe I recall that yesterday you testified that you were the one that contacted [Amy] and [Sherry] about getting together late that day and doing whatever you were going to do that night. Is that correct?
>
> A      I contacted [Amy]. [Sherry] was already at my house.
>
> Q      Okay. And were you part of the plan or talking with [Sherry] and [Amy] to deceive your respective parents to not go and -- to [Amy's] house? Were you part of that plan?
>
> [THE STATE]:  I'll object to that question, Judge. There's been no testimony and no evidence offered there was any plan of deception toward the parents.
>
> THE COURT:  I'll sustain the objection.
>
> [THE STATE]:  Ask for an instruction to the jury to disregard that ridiculous question.
>
> THE COURT:  I'll instruct the jury to disregard the last question.

14

[BY CLAY'S COUNSEL]: Your Honor, we're going to take exception to the word used ridiculous. That was a question asked in good faith.

THE COURT: All right. I'll sustain as to sidebar.

Marie and Sherry had testified that they left Marie's home with the intention of going to babysit Amy's niece, but, prior to Marie's testimony, Amy had testified as follows:

Q    Okay. Now, isn't it true that you, in concert with [Marie] and [Sherry], told -- were -- made up this story about where you would be that night?

A    Yes, sir.

Q    And did all three of you agree that you would lie to your parents about where you were going to be?

A    Yes, sir.

Q    And you were not going to tell your parents where you were going to be?

A    No, sir.

Q    Now, with regard to the lie, what did the three of you agree that you were going to tell your parents to cover up where you were actually going to be?

A    We was [sic] going to my house to watch my niece.

There was testimony from another victim that all of the females participated in a plan to deceive their parents that night. Cross-examination was attempted on whether Marie acknowledged participating in a plan to dupe her parents on the day of these offenses. All evidence that is relevant is admissible, except as provided otherwise. TEX. R. EVID. 402. Evidence is relevant if it has any tendency to make the existence of a fact of consequence more

15

or less probable. TEX. R. EVID. 402. All witnesses may be cross-examined on any matter relevant to any issue in the case, including credibility. TEX. R. EVID. 611(b).

But the Rules limit evidence of specific instances of conduct of a witness for the purpose of attacking the witness' credibility other than by proof of conviction of a crime. TEX. R. EVID. 608(b). Whether the victims fabricated a story that they were going to one of the girls' homes to watch a niece that night is irrelevant as to whether Clay sexually assaulted Marie that night. This is primarily an attack on general credibility which is allowed, but limited by the Texas Rules of Evidence.

The Court of Criminal Appeals explained in *Hammer* that in sexual assault cases, the credibility of the complainant and the defendant are often dispositive issues. *Hammer*, 296 S.W.3d. at 561–62. But a distinction must be made between an attack on the general credibility of a witness and a more particular attack on credibility that reveals "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* at 562 (quoting *Davis*, 415 U.S. 308). The defendant does not have an absolute right to impeach the general credibility of a witness, but the Constitution would be violated if the defendant could not impeach a witness for possible motives, biases, and prejudices to such an extent he could not present a vital defensive theory. *Id.* 562–63.

Here, the attempted impeachment was an attack on the witness' general credibility—"you lied to your parents so we may infer that you are lying about this sexual assault." This evidence may demonstrate a teenager lied to her parents about where she was going at night, but it is not

16

relevant as proof of bias, prejudice, or ulterior motive for her to accuse Clay of sexually assaulting her.

The trial court did not err in finding this evidence was a specific instance of conduct presented only for a general attack on credibility and was, therefore, inadmissible. TEX. R. EVID. 608(b). This ruling was within the zone of reasonable disagreement and, therefore, discretionary with the trial court. *Montgomery*, 810 S. W. 2d at 379–80.

## V. Limitation of Evidence from Ann Wafer

In his fourth point of error, Clay argues that the trial court erred by preventing a defense witness, Ann Wafer, from testifying regarding Marie's prior cocaine use and her prior visits to the alleged crime scene.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard and we will not disturb the trial court's ruling if it is within the zone of reasonable disagreement. *Id.* at 379–80, 391.

On direct examination by the State, Marie testified that she had never been to James' house before that night and she had never seen cocaine lines before. Clay intended to call Wafer, a friend of James who was present at James' house on the night in question, for the purpose of impeaching that portion of Marie's testimony as well as to rebut the State's evidence regarding the use of a deadly weapon. Specifically, Wafer would testify that Marie had been at James' house with Clay before, that Marie had used cocaine there in the past, and that she did not see

17

any guns or use of force on the night in question.[6] The State objected and claimed that the proffered testimony was inadmissible under Rule 608(b) of the Texas Rules of Evidence, which states:

> Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than the conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence.

TEX. R. EVID. 608(b). The trial court allowed Wafer to testify regarding whether she remembered seeing guns at James' house, but the court held that under Rule 608(b), she could not testify regarding Marie's prior drug use or visits to James' house.

The general rule is that a party is not entitled to impeach a witness on a collateral matter. *Ramirez v. State*, 802 S.W.2d 674, 676–77 (Tex. Crim. App. 1990). A collateral matter is one that is not relevant to proving a material issue in the case. *See id.* "The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea." *Id.* at 675 (quoting *Bates v. State*, 587 S.W.2d 121, 133 (Tex. Crim. App. 1979)). However, when a witness leaves a false impression concerning a matter relating to his or her credibility, the opposing party is allowed to correct that false impression. *Sherman v. State*, 20 S.W.3d 96, 101 (Tex. App.—Texarkana 2000, no pet.) (citing *Ramirez*, 802 S.W.2d at 676). Courts construe this false impression exception narrowly. *James v. State*, 102 S.W.3d 162, 181 (Tex. App.—Fort Worth 2003, pet. ref'd).

---

[6] In a bill of exceptions, Wafer testified that she was present at James' house on the night in question. She had seen Marie and Clay alone at James' house on a prior occasion, and she had also seen Marie using cocaine before. She did not see anyone carrying a gun that night. She also testified that James did not own a gun and she had never seen a gun in his house.

Generally, when a witness makes a statement of good conduct or character on a collateral issue, the opposing party may cross-examine the witness with specific instances, rebutting that false impression, but may not offer extrinsic evidence to prove the impeachment acts. *Daggett v. State*, 187 S.W.3d 444, 453 n.24 (Tex. Crim. App. 2005). But where the statement of good conduct is directly relevant to the offense charged, the opponent may both cross-examine the witness and offer extrinsic evidence rebutting the statement. *Id.*[7]

> Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness' credibility in terms of his general veracity. In contrast, the concept of impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false because contradicted by other evidence:
>
> > Direct examination testimony containing a broad disclaimer of misconduct sometimes can open the door for extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible under Rules 404 and 608(b) and is, thus, collateral. This approach has been justified on the grounds that the witness should not be permitted to engage in perjury, mislead the trier of fact, and then shield himself from impeachment by asserting the collateral-fact doctrine.

*Id.* (quoting *United States v. Castillo*, 181 F.3d 1129, 1132–33 (9th Cir. 1999); 2A *Charles A. Wright & Victor J. Gold*, Federal Practice and Procedure § 6119 at 116–17 (1993)).

The alleged offense in this case was sexual assault. Marie's statement of good conduct dealt with her unfamiliarity with cocaine lines, which is not directly relevant to the charged offense. Clay could have attempted to correct any false impression left by Marie's testimony when he cross-examined her at trial. But since this evidence did not directly relate to the charged

---

[7]In *Daggett*, the defendant was charged with sexual assault of a child. He testified, "I would not do something like that . . . " and "I have never done anything of that sort with a sixteen your old girl, period." The statement of good conduct was directly relevant to the charged offense, which allowed the State to introduce evidence from another teenage witness of other sexual assaults by the defendant. *Daggett*, 187 S.W.3d at 453–54.

offense of sexual assault, Clay was not entitled to correct the alleged false impression by calling other witnesses or offering extrinsic evidence. *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002) ("the opponent must correct the 'false impression' through cross-examination of the witness who left the false impression, *not* by calling other witnesses to correct that false impression"). Therefore, the trial court did not err in excluding the testimony, and we overrule this point of error.

## VI.     Failure to Grant a Continuance

Pursuant to Section 74.094 of the Texas Government Code, on the morning of October 19, 2011, the day of the charge conference and closing arguments, Donald Dowd, the County Court at Law Judge of Cass County, took the bench in place of the presiding judge, the Honorable Ralph Burgess, 5th District Court in Cass County, Texas, because Judge Burgess was too ill to preside over the day's trial proceedings. In his final point of error, Clay contends that Judge Dowd erred by failing to grant a continuance.[8]

Clay objected to the judicial substitution and requested a continuance because Judge Dowd, having not presided over the trial, was not familiar with the jury selection, opening statements, or any of the testimony or evidence in the case. Clay also argued:

> Judge, we believe the substitution is improper at this time because we don't see how the Court could make any rulings during arguments on evidence within or outside the record and how far counsel might stray from that evidence, making the Court flying blind, so to speak.

Judge Dowd overruled the objection and the request for continuance.

---

[8]On appeal, Clay also contends that the trial judge erred by failing to recuse himself. Generally, error that is not preserved may not be raised for the first time on appeal. TEX. R. APP. P. 33.1(a)(1)(A); *Mendez v. State*, 138 S.W.3d 334, 338 (Tex. Crim. App. 2004). Because Clay failed to move for recusal, this issue was not preserved for our review.

A trial court's ruling on a motion for continuance is reviewed under an abuse of discretion standard. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). For Clay to establish an abuse of discretion, he must show that the trial court erred by denying his motion and that he was harmed by the denial of a continuance. *Gonazalez v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

Here, Clay cites to a few examples in the State's closing arguments where, he claims, the State mischaracterized the facts and the questions asked during the trial.[9] However, Clay failed to cite any authority in support of his argument that the trial court erred by denying his motion, and we are aware of none. *See id.* We find the trial court was within its discretion to deny the motion. Accordingly, we overrule this point of error.

We affirm the trial court's judgment.


Jack Carter
Justice


Date Submitted::      November 6, 2012
Date Decided::        December 28, 2012

Publish

---

[9]Clay does not argue that the trial court erred in overruling his objections to the State's alleged mischaracterizations.