In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-16-00021-CR
_____

## GLEN NAYLOR JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law No. 2
Jefferson County, Texas
Trial Cause No. 308687**

## MEMORANDUM OPINION

A jury found Glen Naylor Jr. (Naylor or Appellant) guilty of the offense of terroristic threat of a family member. The jury assessed punishment at 365 days' confinement and a $4,000 fine.[1] The court entered a finding of guilty, sentenced Naylor to one year in jail, and placed Naylor on probation for two years. Naylor

---

[1] The jury's verdict contained in the clerk's record and the reporter's record of the trial indicate that the jury recommended that the fine be probated. The judgment indicates that the jury recommended that both the fine and confinement be probated.

1

timely filed a notice of appeal, and in a single issue, he challenges the sufficiency of the evidence to support his conviction.

EVIDENCE AT TRIAL

Naylor was charged by information with the offense of terroristic threat of a family member for placing C.N. in fear of imminent serious bodily injury by threatening to kill her.[2] The probable cause affidavit supporting Naylor's arrest states, in relevant part:

> On July 27, 2014 at 2337 hours, I was dispatched . . . in reference to a disturbance. Dispatch advised that the actor had a 9mm firearm and was chasing the complainant. Upon arrival at the location, I met the victim and the actor, who was later identified by Texas Driver's License as Glen Naylor . . . after he exited the front door. Naylor and the victim are currently in their 10th year of marriage.

> While speaking to the victim, she advised that during a verbal disturbance, Naylor retrieved a Glock 9MM, inserted a magazine into the weapon and racked the slide back and pointed the firearm at her. Naylor then told the victim as he pointed the firearm at her, "I'm going to kill you and you will be dead in less than an hour." When she ran off, she observed Naylor place the firearm into his pocket of his shorts and follow her. The victim stated she hid from Naylor as she observed him with a flashlight in the back yard []. When I arrived on scene, she was standing with her back to the fence, looking at the front of the house. Shortly after making contact with the victim, Naylor emerged from the house and was detained while the initial investigation was completed.

---

[2] We use initials to refer to the alleged victim. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

> Due to Naylor conveying a threat of violence that placed the victim in fear of serious, imminent serious bodily injury and my belief that further violence would continue without Police Intervention I placed Naylor under arrest for Terroristic Threat-Family Violence.

Naylor pleaded "[n]ot guilty[]" to the offense.

Testimony of C.N.

C.N. testified that, on July 27, 2014, she was on a "family outing" with Naylor and their son at their property in Kirbyville.[3] According to C.N., after the family returned to their home in Beaumont in the evening, Naylor asked her questions about M.L., a man with whom she worked. C.N. explained that Naylor found out that M.L. was trying to help C.N. get away from Naylor because C.N. and Naylor had a lot of problems. C.N. also testified that Naylor asked whether she had been faithful in their marriage and that Naylor thought she was having an affair with M.L. C.N. testified that Naylor told her he was going to have some people come over, even though it was very late in the evening, and she further explained that:

> He said that -- that they had [M.L.] -- which is the person that he thought I was having an affair with -- that they had [M.L.] in the car; and he was bloody; and if he could talk, he was going to ask him questions. And if our stories didn't add up, he was going to kill me; and he was going to kill [M.L.]; and I would be dead within an hour.
>
> . . . .

---

[3] C.N. explained that although she and Naylor had been married, they were no longer married at the time of trial.

. . . [Naylor] said, when they get here, [] if he has a different story than you have, I'm going to kill you. You're going to be dead within an hour.

According to C.N., Naylor said "many times[]" that he would kill her if she was lying to him. At trial, C.N. denied that she and M.L. had a sexual relationship or that she had a romantic interest in M.L.

C.N. explained that Naylor asked her to help him take things out of the truck, which included guns they had taken to the Kirbyville property:

[C.N.]: We walked over to the truck; and he opened the doors; and he got the Glock 9mm case out; and I thought he was just going to hand it to me. And he opened it; and he loaded the -- the --

[State's attorney]: Magazine?

[C.N.]: Yeah, the thing that holds the bullets. He loaded bullets in it; and then he put it into the gun; and he pulled the -- the --

[State's attorney]: I think it's called a slide.

[C.N.]: Okay. He -- he loaded it; and then he pointed it at me. And he told me, he said, I'm telling you now. You stupid B, if you're lying to me, [C.N.], I'm not playing. I'll kill you.

C.N. told the jury she went back to the house and then out the back door to get away from Naylor, and he followed her. According to C.N., she hid from Naylor because he had a gun, she was afraid he was going to shoot her, and she wanted to call the police. She could see Naylor with the gun and looking for her with a flashlight. C.N. testified that she was scared and she felt like Naylor was "hunting" her. She

4

explained that she felt trapped and that, even though her father lived next door, she could not go to her father's house because the gate was locked.

C.N. testified that she turned on a recording app on the cell phone she was carrying and recorded for about twelve or thirteen minutes. C.N.'s recording was admitted as State's Exhibit 1. According to C.N., she stopped recording when she saw Naylor coming down the driveway and he spotted her, and she called 911. The 911 recording was admitted as State's Exhibit 2 and published to the jury. C.N. explained that the police arrived quickly, and that Naylor did not have the gun when the police arrived, but the police found the gun in the bedroom. C.N. testified that, after questioning her and Naylor, the police arrested Naylor and she obtained a temporary protective order.

Testimony of Officer Betar

Officer Robert Betar (Officer Betar or Betar), with the Beaumont Police Department, testified that he and Officers Campbell and Breaux were dispatched to the Naylor home on the evening of July 27, 2014, concerning a disturbance. According to Officer Betar, when they arrived, C.N. "had her back up against the fence[.]" Naylor came out of the front door, and Betar had Naylor at gunpoint because dispatch had said Naylor "was actively looking for [C.N.] with a gun." Betar described his observation of and discussion with C.N. that night:

5

[Betar]: She was -- she was scared. She was -- you could tell she was distraught. She was crying. She was -- her speech was cracking when she was talking to me. She was breathing fast. She was just shaking.

[State's attorney]: Okay. And based on those observations and your discussion with her, what did she relate to you as to what had occurred?

[Betar]: Pretty much that [Naylor] had pointed a gun at her saying that he was going to kill her; and he was going to kill whoever she had been talking to or whatever.

[State's attorney]: All right. What did you do as far as your investigation from that point forward?

[Betar]: What did she tell me?

[State's attorney]: Yes, sir.

[Betar]: Is that what you're asking? She told me that -- that [Naylor] found out that she was messing around with someone -- with someone else; and during this entire time, according to her, she was texting -- Mr. Naylor was texting another dude saying hey, send me a picture of the guy with a bloody face, I guess. And then he was going to have those same people bring the guy over to the house; and if he didn't tell him the same story as what [C.N.] did, that he was going to shoot them both. He was going to kill them both.

Officer Betar testified that they searched for the gun C.N. had described, and that Officer Campbell found the gun on a dresser in a bedroom in the house. According to Betar, the gun found on the dresser matched the description of the gun C.N. had reported Naylor had pointed at her. Betar further testified that C.N. told the police that Naylor had searched for her in the yard with a flashlight and a gun, and C.N. hid from Naylor. According to Officer Betar, C.N. was scared and traumatized, and C.N.

6

appeared to be in fear of imminent harm as a result of the event. Officer Betar explained that he listened to the recording C.N. made with her cell phone and he heard Naylor say he was going to kill C.N.:

> [State's attorney]: But did you hear anything in particular from what was on a recording that [C.N.] shared with you at the scene?
>
> [Betar]: As far as [Naylor] threatening to kill her?
>
> [State's attorney]: Yes, sir.
>
> [Betar]: Yes. I heard -- I heard that; and then I asked her if he had the gun in his hand at that time; and she told me no.
>
> [State's attorney]: At the point that she said that he didn't; but did she later on -- did she relate that he did, in fact, chase her with a gun, with a loaded gun?
>
> [Betar]: Yes, sir.

According to Officer Betar, C.N. told him "she had never been so scared before in her life." Betar explained that, based on what C.N. told him that night, he believed that further violence would occur if the police took no action, and he arrested Naylor. Betar agreed that he filed the probable cause affidavit in this case.


Testimony of Glen Naylor

Naylor testified on his own behalf. According to Naylor, at some point in July of 2014, he received a text message from M.L.'s wife that caused Naylor to believe

7

that C.N. was having an affair with M.L. At the time, Naylor did not confront C.N. about it because C.N.'s mother had just died.

Naylor agreed that right before this incident, his family took a trip to their property in Kirbyville and that they returned home after dark. According to Naylor, about three or four days earlier, he had shown C.N. the message he received from M.L.'s wife, and C.N. denied the affair. Naylor explained that, on the night of the incident, he was on the porch smoking and C.N. came out and "acted kind of weird, like she was wanting a confrontation for some reason." Naylor told the jury he tried to get away from C.N. and told her "you can lie all you want[.]" Naylor testified that he told C.N. that he loved her but he did not trust her and he wanted a divorce.

Naylor agreed that his intent that night was to put some distance between C.N. and himself. According to Naylor, at that point, he called his brother and asked the brother to help move Naylor's things and Naylor started unloading things from the truck, which included a pistol. Naylor explained that he put a rifle and long guns inside the house under the bed and he put the other guns on top of the dresser next to the bed. According to Naylor, his son told him that C.N. had gone back outside, and that when Naylor went outside, C.N. was "freaking out at the fence. Oh, my God. Oh, my God. He's going to kill me." Naylor testified that C.N. was on the phone with law enforcement, and police then arrived at the house. Naylor explained

that he showed one of the officers the messages on his phone. Naylor denied hitting or touching C.N., and he denied pointing a gun at C.N. or threatening to kill her.

Naylor testified that he had communicated with M.L., after which he "wanted to get [his] hands on [M.L.]." Naylor also explained that "[w]hen I get upset I get loud[]" but Naylor denied that he ever put his hands on C.N. or on any woman. On cross-examination, Naylor agreed that C.N. "concocted this entire situation[]" and she "lied to the jury under oath about what happened[.]"

Additional Testimony by C.N.

After Naylor testified, the defense re-called C.N. to testify. C.N. agreed that on or about January 8, 2015, she and Naylor talked by phone and that she and Naylor talk frequently. According to C.N., Naylor wanted to reconcile with her, but she did not want to reconcile if Naylor was in communication with a particular woman Naylor had seen throughout their marriage. C.N. explained that C.N. continues to speak with Naylor frequently for the sake of their child. She agreed that, on the night of July 27, 2014, Naylor had a gun, Naylor threatened her, and she was in fear of her life.

STANDARD OF REVIEW

In a single issue, Appellant challenges the sufficiency of the evidence to support the verdict. In particular, Appellant argues that only two people were present

9

when the alleged offense occurred – Naylor and C.N. – they gave conflicting reports of what occurred, and the evidence merely showed certain marital problems.

When an appellant challenges the sufficiency of the evidence supporting a conviction in a criminal case, appellate courts consider all of the evidence in a light most favorable to the verdict and must decide, after reviewing the evidence in that light, whether a rational trier of fact could have found the appellant guilty of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015) (citing *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

In reviewing sufficiency challenges, we are required to give deference to the jury's findings and conclusions, as it was the jury's responsibility to fairly resolve all conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to resolve whether the defendant is guilty of violating the criminal provision that is at issue at trial. *See Hooper*, 214 S.W.3d at 13. The

jury may reject or accept some, all, or none of a witness's testimony. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613 (Tex. Crim. App. 1974)). "'When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.'" *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (quoting *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)).

SUFFICIENCY OF THE EVIDENCE

A person commits the offense of terroristic threat of a family or household member if "he threatens to commit any offense involving violence to any person or property with intent to . . . place any person in fear of imminent serious bodily injury . . . [and] the offense is committed against a member of the person's family or household[.]" *See* Tex. Penal Code Ann. § 22.07(a)(2), (c)(1) (West 2011). A threat can be verbal or nonverbal. *Smith v. State*, 286 S.W.3d 333, 343 (Tex. Crim. App. 2009).

An accused's threat of violence, made with the intent to place the victim in fear of imminent serious bodily injury, is what constitutes the offense. *Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. [Panel Op.] 1982). "Once the defendant makes a threat to commit a violent offense seeking the 'desired reaction to place a person in fear of imminent serious bodily injury,' the offense of terroristic threat is completed." *Williams v. State*, 432 S.W.3d 450, 454 (Tex. App.—San Antonio 2014, pet. ref'd) (quoting *Dues*, 634 S.W.2d at 306). "It is not necessary for the victim to actually be placed in fear of imminent serious bodily injury or for the accused to have the capability or the intention to actually carry out the threat." *Williams v. State*, 194 S.W.3d 568, 574-75 (Tex. App.—Houston [14th Dist.] 2006), *aff'd on other grounds*, 252 S.W.3d 353 (Tex. Crim. App. 2008). Although a victim need not

12

actually be placed in fear of imminent serious bodily injury, "[t]he desired and sought after reaction of the victim, regardless of whether the threat was real or was carried out, is some evidence of the defendant's intent to place the victim in fear of imminent serious injury." *Id.* at 575. Further, the requisite intent can be inferred from the actions, words, and conduct of the accused. *Id.* (citing *Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980)).

In this case, the jury heard C.N. testify that Naylor made verbal threats to kill her, that Naylor pointed a gun at her, and that she felt as though Naylor was hunting her. Officer Betar testified that C.N. told the officer that Naylor threatened her and that C.N. appeared scared and traumatized. The jury also heard a recording of C.N.'s phone call to 911 wherein she reported that Naylor was verbally threatening to kill her and that he was threatening her with a gun. The jury could have believed C.N. and disbelieved Naylor. *See Lancon*, 253 S.W.3d at 707; *Sharp*, 707 S.W.2d at 614; *see also Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981) ("As the exclusive judges of the facts, the jurors may believe or disbelieve all or any part of a witness's testimony."). In reviewing all the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Naylor threatened to commit a violent offense against C.N. with the intent to place C.N. in fear of serious bodily injury. *See Jackson*, 443 U.S. at 318-19; *Temple*, 390 S.W.3d

13

at 360. Therefore, we conclude the evidence is legally and factually sufficient to support Naylor's conviction. We overrule Appellant's issue on appeal, and we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on October 31, 2016
Opinion Delivered November 2, 2016
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

14