

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00074-CR

JUSTIN WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 20F0015-202

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

A Bowie County jury convicted Justin Williams of the capital murder of his cellmate, Pete Ayala, *see* TEX. PENAL CODE ANN. § 19.03 (Supp.), and the trial court sentenced him to life imprisonment without the possibility of parole. Williams claims his conviction should be reversed because the evidence was legally insufficient to prove he intentionally or knowingly caused Ayala's death. Because we conclude there was sufficient evidence to support the jury's verdict, we affirm the trial court's judgment.

## I. Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 596, 607 (Tex. Crim. App. 2018). "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (quoting *Adames*,

353 S.W.3d at 860). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

"In reviewing the sufficiency of the evidence, we should look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'"" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).

3

A person commits the offense of capital murder if the person, while incarcerated for murder, TEX. PENAL CODE ANN. § 19.03(a)(6)(A), "intentionally or knowingly causes the death of an individual," TEX. PENAL CODE ANN. § 19.02(b)(1) (Supp.). Williams does not contest that he was incarcerated for murder at the time he attacked Ayala.

"Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent." *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (quoting *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008), *abrogated in part on other grounds by Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012) (orig. proceeding)); *see Campbell v. State*, 664 S.W.3d 240, 247 (Tex. Crim. App. 2022) (discussing that capital murder with an aggravating circumstance is a result-of-conduct offense with a circumstances-surrounding-the-conduct element).

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

"Intent and knowledge are fact questions for the jury and are almost always proven through circumstantial evidence." *Clay v. State*, 390 S.W.3d 1, 8 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). "A jury may infer intent or knowledge from any facts which tend to prove its existence, including the acts, words,

4

conduct of the accused, and the method of committing the crime." *Lopez v. State*, 672 S.W.3d 915, 923 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd) (quoting *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 1994)). "Intent to kill may also be inferred from the nature and extent of the injuries inflicted on the victim." *Id.* (citing *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992) (holding that the intent to kill could be inferred from location and depth of a stab wound)). "A jury may also infer knowledge from such evidence." *Id.* at 923–24 (citing *Hart*, 89 S.W.3d at 64).

## II.     The Evidence at Trial

Williams was convicted of the offense of capital murder against Pete Ayala "by beating and/or kicking and/or stomping" him during a time they both were incarcerated as cellmates in the Texas Department of Criminal Justice (TDCJ) Telford Unit—Williams being incarcerated for murder. On June 25, 2017, between 3:00 a.m. and 3:30 a.m., Williams and Ayala fought in their cell. When TDCJ correctional officer Wesley Woods delivered breakfast to Williams's cell around 4:30 a.m., he saw Ayala on the floor, seriously injured, and he called for help. Medical assistance soon arrived and found Ayala unresponsive. Ayala was taken to a local hospital, where he later died from injuries so severe that nothing could be done for him.

### A.     Williams's Statement

At 11:00 a.m. on the morning of the incident, Williams gave a voluntary statement to Investigator Ronald Stafford of the TDCJ Office of the Inspector General, who was officed at the Telford Unit. Williams's statement was admitted into evidence with no objection.

5

In his statement, Williams explained to Stafford that he and Ayala had "been having issues" in their cell. Williams had tried to get Ayala to fight him before, but Ayala did not want to fight. Williams said he really did not have a problem with Ayala—he "really didn't hate him." Ayala acted timid, and Williams decided to "leave him alone" and "give him a chance"; but Ayala "continued with that same . . . b---s---," and Williams told Ayala again that they had to fight. Again, Ayala did not want to fight. Williams said he just wanted to have a "quick little fight" and that he was "not gonna stomp on [Ayala]." Williams said, "I really meant that, I wasn't gonna stomp on him . . . [if] I . . . didn't really like him and he really just pressed my buttons like that and I hated him, yeah, I would have stomped on him." Williams said Ayala was not aggressive and Ayala was trying to avoid a fight, but Williams said Ayala still had an attitude and Williams wanted to "get it out of the way."

Willliams finally convinced Ayala to fight him on the morning of the altercation. Williams stated that Ayala first said he wanted to move from the cell, but Williams said if he did, Ayala would have to leave all his property in the cell.[1] Ayala would not do that.

As they began to fight, Ayala "tried to wrestle" with Williams, which Williams did not want to do because he did not "have the endurance for that." Williams said when Ayala tried to wrestle him to the ground, that showed Williams that Ayala was trying to hurt him.

Williams said he hit Ayala—"boom-boom-boom"—and Ayala fell. Williams said, "That was it. I ain't letting you up." Ayala really didn't "mak[e] no fight." Williams said he had Ayala by his head and Ayala was asking him to let him up, but he could tell Ayala was trying to

---

[1]Stafford testified that if an inmate agreed to leave his cell and left his property behind, that innate might be "perceived as weak" and might "fall prey to other events."

push off and get up and continue wrestling, so Williams would not let him up. Williams said he "did [Ayala] like [he] did him" because Ayala "tried to wrestle [him] to the ground." Williams said he "wasn't even going to stomp [Ayala] that many times but he kept on moving, trying to get [up]." So, Williams "kept on stomping him." Williams stated, "I ain't use no weapon, I ain't sucker punch the dude, I ain't do nothin'. It was a square fight." Williams said he stomped Ayala about ten times.

Williams said he tied Ayala up because he "kept on twitching like he was having a seizure." Williams said he really did not know why he tied Ayala up because Ayala was already "unconscious on the floor."

When asked if he knew how badly Ayala was hurt, Williams responded that he "knew [Ayala] was out of it," but he "didn't hate him." Williams said he could have "unleashed the beast on him," but he "just stomped him on his face." Williams expressed incredulity that Ayala "let [him] stomp on his face," saying perhaps Ayala thought if he let Williams do that, he would stop.

Williams said Ayala "started going into cardiac arrest or something" and "he acted like his body just locked up," but Ayala started moving some more. Williams kicked Ayala again, stomped him again, and then tied him up.

Williams agreed that Ayala's head bounced on the floor when he stomped him. When asked how many times he kicked him, Williams said, "I kicked him. I kicked him one time. Kicked him one time. Stomped him." Stafford asked Williams if he kicked Ayala "[i]n the

head." Williams responded, "Yeah. Kicked him. Stomped him. Kicked him. Stomped him. Stomped him. Stomped him. Stomped him. And tied him up."

Williams said the two offenders next door came out of their cell to check on Ayala and said Williams should throw some water on Ayala, it was over, and Williams should let him up. Williams said it was already over and stated, "[T]here ain't no letting him up, he ain't getting up . . . I ain't throwing no water on him. . . . He a'ight."

Williams was uninjured.

When asked why he did not report Ayala's injuries, Willliams said he was thinking about what he was about to do. Williams said he was able to clean up the blood, but he was just trying to get his thoughts together. Williams said he did not know what he was about to do, but he probably would have thrown water on Ayala, let him come to, and cleaned up the blood; but Ayala was really acting like he was dying, so Williams probably would have eventually reported it.

The officer delivering breakfast called the incident in. Williams was covering up the slot in the door, but the officer saw Ayala on the floor in the cell behind Williams.

Williams expressed surprise that he might be segregated for fighting and that they were calling his cell a crime scene.

### B. Officer Testimony

Woods testified that on the morning of the incident, he was passing out breakfast. Williams had his arm blocking the food slot in the cell door, and there was a bedsheet blocking the view through the window. Williams refused to remove the sheet, so Woods looked through

8

the food slot and saw Ayala lying on the floor. Woods called for a supervisor and medical assistance. Ayala "was seriously injured, his face was swollen, his eyes were swollen shut, his face had turned red, dark red, and . . . he was tied up." Ayala was unconscious and unresponsive.

Williams did not ask for assistance for Ayala and initially told Woods that Ayala had taken a narcotic and "was hitting his head against the wall."

Woods and Tony Rust, a captain at the TDCJ Telford Unit, got Ayala out of the cell and downstairs where medical staff and Rust then transported Ayala to the Telford Unit infirmary.

Rust testified that on the date of the incident, he was the nightshift supervisor. Rust responded to the call for assistance for Williams's cell. They found Ayala lying on the floor, "hog tied." Ayala's "legs were pulled back, his arms were behind his back, and there was blood on the ground." Rust and medical staff transported Ayala to the Unit's infirmary and called for an ambulance because Ayala's injuries were "beyond [their] capabilities to handle."

C.      Medical Testimony

Dr. Farahnaz Haroon testified that he was on call at the hospital when Ayala was brought in, and he later pronounced Ayala's death. Haroon testified that when Ayala was brought in, he was unresponsive and had a baseball-sized hematoma above his left eye and a golf ball-sized hematoma above his right eye. Ayala had blood in his nose and coming out of one of his ears and his mouth. Ayala had an extensive brain bleed with a subdural hematoma, a subarachnoid bleed, and swelling in his temporal lobes. Ayala's brain had swollen so much that it was herniating into the spinal cord area, which Haroon deemed "a very grave sign," indicating that Ayala would die soon thereafter.

9

Ayala's family arrived and directed that he not be resuscitated, so care was withdrawn, and Ayala was pronounced dead. Haroon said there was nothing that could be done for Ayala—his "injuries were so severe that no matter what would be done it was just a matter of time."

Dr. Jill Urban, a forensic pathologist from the Dallas County Medical Examiner's Office, testified that Ayala died as a result of blunt-force injuries. Urban testified that most of Ayala's "injuries were concentrated in the region of his head." Urban stated that there is typically no blood in the scalp and skull area, but Ayala's entire scalp and entire skull were hemorrhaged—"all areas of bleeding from impact." Ayala's skull was fractured on the left side. The exterior of a person's brain is typically gray, and no blood is observed on the surface during an autopsy. Ayala's brain was "very abnormal" in that the entire surface of his brain was red from blood.

## III. Legally Sufficient Evidence Supports the Jury's Verdict

In his sole issue on appeal, Williams argues the evidence at trial was insufficient to establish that he intentionally or knowingly caused Ayala's death. As stated above, a person incarcerated for murder commits capital murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(6)(A). And intent and knowledge can be inferred from circumstantial evidence, including the method of committing the crime and the nature and extent of the injuries inflicted on the victim. *See Clay*, 390 S.W.3d at 8; *Lopez*, 672 S.W.3d at 923–24.

Williams said he intended to fight Ayala to resolve personal issues, even though Ayala told him multiple times that he did not want to fight. Soon after the fight began, Ayala fell to the floor, and Williams would not let him up because he perceived Ayala was trying to wrestle him.

10

Williams kept Ayala on the floor by kicking and stomping him multiple times until Ayala was twitching like he was having a seizure or going into cardiac arrest. Even at that point, because Ayala moved again, Williams kicked and stomped him again. By his own account, Williams stomped Ayala ten times and kicked him at least four times, including multiple contacts with Ayala's head and face.

Ayala's injuries were so severe that nothing could be done to save him.

Williams questions the sufficiency of the evidence against him based solely on statements made during his interview with Stafford hours after Ayala's death: he did not mean to kill Ayala, he just wanted to fight; the fight did not last very long; he did not strike Ayala after he bound him up. But the jury was free to disregard all of Williams's self-serving statements. *See Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). And the jury was free to instead reasonably infer, from the facts, that Williams attacked Ayala as he laid on the ground, tied Ayala up, and inflicted mortal injuries upon him, that Williams intentionally or knowingly caused Ayala's death. *See Lopez*, 672 S.W.3d at 923–24. Further, Williams attempted to block the scene from Woods when he delivered breakfast about an hour after the fight, and Williams initially lied to Woods about how Ayala became injured. Conduct in which a defendant attempts to hide his culpability may be viewed as "consciousness of guilt and an attempt to cover up the crime." *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

11

Viewing all the evidence in the light most favorable to the verdict, the jury could have found the essential elements of the offense beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609.

## IV.    Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:      September 16, 2025
Date Decided:       December 11, 2025

Do Not Publish