

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00187-CR

_____

ALEJANDRO GARCIA, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 43527-B

_____

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

In the early morning hours of December 23, 2013, Andres Chavez was brutally murdered on the grounds of a mobile home park in Longview. A Gregg County jury convicted Alejandro Garcia of murdering Chavez and assessed his punishment at thirty years' imprisonment in the Texas Department of Criminal Justice Correctional Institutions Division. In addition, Garcia was assessed court costs of $269.00. In this appeal, Garcia asserts that (1) there was insufficient evidence to support his conviction and (2) there was insufficient evidence to support the trial court's assessment of court costs. We find that there was legally sufficient evidence to support Garcia's conviction and to support the assessment of court costs. Finding no error, we affirm the judgment of the trial court.

## I.      Sufficient Evidence Supports the Jury Verdict

In his first point of error, Garcia asserts that the evidence was legally insufficient to prove his guilt beyond a reasonable doubt. He points to three elements of the offense he believes were insufficiently proven: (1) that he intentionally caused the death of Chavez by striking him in the head, (2) that he intended to cause serious bodily injury to Chavez, and (3) that the crime was committed in Gregg County. In his second point of error, Garcia argues that the evidence is factually insufficient to support his conviction based on these same three elements.

### A.      Standard of Review

Under the standard set forth in *Brooks v. State*, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893,

2

912 (Tex. Crim. App. 2010) (plurality op.)[1] (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979));

*Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous

legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at

917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks*

opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at

318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Further, the jury is the

sole judge of the credibility of the witnesses and the weight to be given their testimony and may

"believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d

4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that

decision is based on an evaluation of credibility." *Id.* (quoting *Lancon v. State,* 253 S.W.3d 699,

705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of

the offense and may rely on actions of the defendant which show an understanding and common

design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d

---

[1]Although *Brooks* is a plurality opinion, in unanimous opinions issued after *Brooks*, the Court of Criminal Appeals has instructed the Courts of Appeals that, in light of *Brooks*, we should not address an appellant's factual sufficiency claims. *See Merritt v. State*, 368 S.W.3d 516, 528 n.11 (Tex. Crim. App. 2012) (Alcala, J. not participating); *Archie v. State*, 340 S.W.3d 734, 742 n.30 (Tex. Crim. App. 2011). Garcia recognizes the holding in *Brooks*, but argues that the Court of Criminal Appeals may revisit its holding in that opinion in a case that was before that court when he filed his brief. Therefore, he invites us to consider his factual sufficiency claim in this case. However, on October 19, 2016, the Court of Criminal Appeals decided *Walker* without addressing whether the *Brooks* opinion should be overruled. *Walker v. State*, No. PD-1429-14, 2016 WL 6092523, at *4 n.1 (Tex. Crim. App. 2016) (not designated for publication). Therefore, *Brooks* remains the controlling precedent, and we should not address factual sufficiency claims. Accordingly, we overrule Garcia's second point of error.

107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

The indictment charged that, on December 23, 2013, in Gregg County, Texas, (1) Garcia intentionally or knowingly caused the death of Chavez by striking him with a bat, or (2) with the intent to cause serious bodily injury to Chavez, Garcia committed an act clearly dangerous to human life that caused the death of Chavez by striking him with a bat. Therefore, based on the indictment and the statute, the State had to prove beyond a reasonable doubt that, on or about December 23, 2013, in Gregg County, Texas, Garcia, either (A) (1) intentionally or knowingly (2) caused the death (3) of Chavez (4) by striking him with a bat; or (B) (1) with the intent to cause serious bodily injury (2) to Chavez (3) committed an act clearly dangerous to human life (4) that

4

caused the death of Chavez (5) by striking him with a bat.  *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011).[2]

### B.  The Evidence at Trial

At trial, Airam Vasquez testified that she had known Chavez about three years and that he had lived with her family for about a year before his death.  She said that Chavez sold cocaine and that his suppliers were upset with him because he had had "a thousand dollars' worth of drugs" stolen from him and could not repay them.  She told the police that these people had threatened to kill Chavez and harm his family if he did not pay them back.  Although she did not know the man making the threats, she told the police that he drove a vehicle similar to a Suburban, but smaller. She also testified that Chavez was in the Crips gang, but that he was short and skinny[3] and was not scary.

According to Vasquez, Chavez was in a relationship with a girl named Monica Ayalin, whom he had met on Facebook approximately two weeks before his death.  Monica had sent Chavez a friend request on Facebook, and within one week they began to exchange private messages, such as "I love you" and "Can't wait to see you," and announced on Facebook that they were in a relationship. Neither she nor Chavez had met Monica before she sent Chavez the Facebook friend request, and she thought the way in which Monica's Facebook account was

---

[2]Although Garcia admitted that he struck Chavez with a bat and does not challenge that the events described in the indictment occurred on the date alleged, he claimed that he left Chavez with only superficial injuries and that other individuals killed Chavez after he left.  Accordingly, the State charged Garcia with Chavez's death, both as the principal actor and under the law of parties.  Nevertheless, because we find sufficient evidence exists to find Garcia guilty as a principal actor, we do not address the sufficiency of the evidence to support his conviction under the law of parties.

[3]Chavez was four feet, eleven inches tall and weighed seventy-seven pounds.

created was strange. Specifically, Vasquez thought it was strange that Monica claimed to be new to Longview, immediately added Chavez as a friend, then started adding his friends, and became friends with over two hundred people in a matter of days. Vasquez last saw Chavez on the night of December 22. Chavez came home from work that night and said that a friend was going to lend him a car and that he was going to meet Monica at a new mobile home park under High Street, where Monica lived. She said that Chavez was very excited because he and Monica had tried to meet before but had been unable to do so.

Pricilla Meza testified that Chavez was an ex-boyfriend with whom she had lived for about six months. They had a bad breakup, and she eventually started dating Garcia and began living with him in Winona. She later stopped dating Garcia and began dating Garcia's good friend, Omar Adame, who also resided at the Winona house.

According to Pricilla, Garcia created the Facebook page of Monica Ayalin. She first became aware of the fictitious Monica when she began receiving messages from her on Facebook. At first, she thought that Monica was a real person. Pricilla eventually realized that it was Garcia pretending to be Monica. Nevertheless, she continued to exchange messages with Monica and even pretended to fight with her because she was still angry with Chavez and wanted him to believe Monica was real.[4]

---

[4]The messages consisted primarily of Monica accusing Pricilla of cheating on her boyfriend and continuing to have sexual relations with Chavez, variously referred to as "Andres" and "Pato."

Yet, even though Pricilla broke up with Chavez on bad terms, they still communicated and continued to have sexual relations through the end of the month before his death. She was also having intimate relations with both Garcia and Adame. On the evening of December 22, she received a text from Chavez. Garcia saw it and got angry. She knew that Garcia did not like Chavez.

Pricilla denied creating Monica's Facebook page and having her Facebook password. She also denied deleting anything on her cell phone related to the case or playing with Garcia's cell phone. She claimed that only Garcia had Monica's Facebook password. However, she admitted that she had engaged in "fake fights" with Monica in order to upset Chavez, but claimed she did not know how her first fight with Monica occurred on the same day Monica's Facebook page was created.

Pricilla made several admissions on cross-examination. First, a few days after the murder Pricilla told the police that she did not know who created Monica's Facebook page, but she admitted that she knew how to set up and operate Facebook pages. She also admitted that she knew how to use two devices to make it look like one person is talking to another on a Facebook page and that, if she had wanted, she could have produced both sides of her Facebook fights with Monica. Finally, she admitted that she was angry with Chavez and wanted to get back at him and explained that that is why she wanted him to believe Monica was real.

Garcia's sister, Perla, testified that, at the time of Chavez's murder, she lived with her mother at the Whistlestop Mobile Home Park (the Whistlestop) in Longview. According to Perla, on the night of December 22 and the early morning of December 23, she was talking with her

7

boyfriend, Rafael Vargas, outside of her house. While they were talking, Garcia arrived and wanted to talk with her. Garcia told her that Chavez wanted to rape her. She knew that Garcia and Chavez already had problems over a girl. She told Vargas what Garcia had told her, and he became alarmed.

Perla also said that Garcia was carrying two pairs of gloves as well as a package containing both a baseball bat and a baseball, and that he said he wanted to fight Chavez. Garcia wanted Vargas' boyfriend to help him, but he refused. Perla testified that she saw Garcia texting someone about Monica's Facebook and that he wanted Vargas to pretend to be Monica's cousin to lure Chavez out of the car. She remembered telling the police that Garcia came over that night to end any chance that Chavez might hurt her. She also remembered Garcia saying that he wanted to hit him.

Perla showed officers the Facebook conversations between Chavez and Monica claiming that they were in a relationship. Perla and Vargas left the mobile home park about 1:00 a.m. and went to Vargas' house. They returned somewhere between 2:00 and 2:40 a.m. and saw Garcia's car and a reddish car near the dumpster area. Perla saw Garcia talking with another man and stated that he looked nervous, like something had happened. She and Vargas left again and returned sometime before 5:30 a.m. When they arrived the second time, Garcia was gone. She then went to bed and slept until the police came.

When the police arrived, the baseball and some packaging was on the table, but the baseball bat was missing. Also, the package of gloves was there, but one pair was missing. At first, Perla was nervous and did not want to talk with the police, but later talked to them. While she was

8

talking with the police, Garcia called. She told the police that Garcia said, "Don't be scared, [Chavez] is in heaven. I didn't do nothing, Juan's friend helped me. They won't talk." She said that Garcia sounded both happy and nervous.

Perla also told the officers that Garcia said he wanted to get rid of Chavez, that she asked Garcia if he killed Chavez, and that Garcia denied killing Chavez. Instead, Garcia said three other people killed him. Garcia also told her not to text his cell phone because the police might track it and asked her to get rid of the baseball, gloves, and trash on the kitchen table. She admitted that Chavez came to the mobile home park because her brother, Garcia, had created a fake Facebook page. Finally Perla testified that, on February 17, 2014, an anonymous letter was found on her mother's car claiming that three other men had killed Chavez. She claimed that she did not recognize the handwriting.[5]

On cross-examination, Perla testified that Garcia was in jail when the note was left on her mom's car. Although she had met Chavez about a year before his death, she did not know if he knew she was Garcia's sister. She admitted that Garcia never told her that he set up Monica's

---

[5]The letter, which was in Spanish and was read to the jury by an interpreter, stated:

> I heard Juan say that they had killed [Chavez]. They were at a friend's house last night at a party. They were drunk and smoking weed. They have a video where they recorded when they were beating up [Chavez]. They took advantage that [Chavez] and [Garcia] were talking. And when [Garcia] saw that they arrived, he left because he was afraid of them.
>
> The video shows how they were beating him, and another friend recorded it. They said they were going to kill [Garcia], but the police had him put in jail. But they said when he gets out, they are going to kill him. It's better if he doesn't get out. Carlos was the one who cut his neck. Carlos has a tattoo on his neck that says, "F*** Love." They drive a red car and a black Cadillac. I don't know where they live, but they go to the dancing places a lot. I'm not saying my name. I don't want them to know that it was me who denounced them.

9

Facebook page. She also testified that the red car she saw had four doors and that the person she saw Garcia talking with might have been Chavez.

Vargas generally confirmed Perla's testimony regarding their interaction with Garcia in the early morning hours of December 23. In addition, Vargas testified that Garcia wanted him to pretend to be a cousin of a fake Facebook girl to lure Chavez to come over, but Vargas refused. As they were leaving the mobile home park the first time, they saw a red, four-door Pontiac, although Vargas originally told police it might have been a Mustang. When they returned in about two hours, they saw the red car. When they first saw it, the car doors were open, but by the time they reached the driveway, the doors were closed. Vargas thought there were three people in the car from the way the doors closed, but he was not sure how many people were in the car. The car then turned around and left.

When Vargas and Perla returned around 5:00 a.m., Vargas saw the same car going away from the garbage dumpsters. He also saw Garcia's car by the dumpsters. According to Vargas, both cars drove away from the dumpsters in different directions, but came together again at Garcia's mother's house. Garcia got out of his car and motioned to him, but Vargas left and did not stop.

The State introduced a receipt from Walmart, which was found in Garcia's bathroom at his house in Winona. The receipt showed a purchase of gloves and a baseball bat and baseball combination package. The State also introduced a baseball and baseball bat combination matching the items described on the receipt. The receipt showed that the purchase was made at 12:09 a.m. on December 23, 2013. In addition, a video disc and a still photograph from the video disc were

10

introduced showing Garcia as he made this purchase. Garcia admitted making this purchase and placing the receipt in his bathroom.

Dan Reigstad, a detective with the Longview Police Department (LPD), testified regarding the search of Garcia's mother's house and his crime scene investigation. He testified that during their search of Garcia's mother's house, he found a baseball wrapped in plastic similar to the plactic found at the scene and packaging for two pairs of cloth gloves. Only one pair of gloves remained in the package.

Reigstad also discussed crime scene photographs showing that Chavez's body was found next to a red car. Reigstad explained, and the crime scene photographs showed, that Chavez had multiple contusions to his face and head, several flattened spots on the left top of his skull, a split in the middle of his skull, numerous marks on the right side, a large gaping neck wound on the left side of his neck, and puncture wounds to his neck.

Reigstad also testified that the police recovered a piece of clear cellophane plastic with dried blood on both sides at the crime scene, and that the plastic was consistent with the cellophane wrapper of the bat previously introduced into evidence. They also found pieces of plastic by Chavez's body, a piece between his legs, and one by his left arm. When they removed the car, they found the hand-grip portion of a broken baseball bat.

Beneath Chavez's body, they found a fingertip from a glove similar to the gloves found in Garcia's mother's house, more plastic, and a bloody piece of paper relating to the baseball bat. On cross-examination, Reigstad testified that Chavez appeared to have been killed where his body was found.

11

Trevor Yates, a detective with the LPD, testified that he was dispatched on December 23 to the Whistlestop, where he found the victim. He confirmed that the Whistlestop was in Gregg County, Texas.[6] Yates generally confirmed Reigstad's testimony regarding the crime scene investigation, the search of Garcia's mother's house, and the search of Garcia's house in Winona. Yates also testified that Garcia had stated in his interview that he had Monica's Facebook name and password. Yates searched Monica's Facebook page and followed clues found there, but had not been able to determine that she existed. He also found numerous romantic public posts between Chavez and Monica, but all of the private posts between them had been deleted.

Yates also testified that they had not recovered Chavez's cell phone, but that they knew a call had been made from his telephone to Pricilla at 6:33 a.m. on the day of his murder, and another to Garcia's telephone on January 8, several weeks after his murder. He also testified of his efforts to locate Carlos Martinez, Alfredo Sanchez, and a man named Juan, who Garcia identified in his statement as the perpetrators of the murder. Although he located men by these names, he could not find anything that connected them to the murder. On cross-examination, Yates testified that he believed that other people were involved in the murder of Chavez. He also agreed that it was a very violent murder and that gangs sometimes do a "message" murder to convey what happens when someone messes with them.

On December 23, Yates interviewed one of Chavez' friends. Hernandez told him that Chavez had gone to meet a girl he met through Facebook. Hernandez also told him that he had

---

[6]Officer Bryan Bankston with the LPD likewise testified that he was dispatched on December 23 to the Whistlestop and that it was located in Longview, Gregg County, Texas.

received a text from Chavez at 4:14 a.m. that morning stating, "[S]ome reds are following me." On cross-examination, Yates testified that "reds" is a term for the Bloods gang, and that he learned that Chavez was associated with PLS, a Hispanic gang associated with the Crips. According to Yates, the Crips are enemies of the Bloods.

John Stash, D.O., who performed the autopsy of Chavez, testified regarding Chavez' injuries. Chavez received blunt force injuries, including abrasions, contusions, lacerations to the face and head, scalp hemorrhages, skull fractures, tongue hemorrhages, teeth fractures, a subarachnoid hemorrhage, hemorrhagic contusions of the brain, abrasions and contusions to the right clavicle, and soft tissue hemorrhage within the testicles. In addition, Chavez had multiple stab wounds and one cut wound to the neck. The cut wound extended from the anterior right to the left side of his neck, injured his skin, fatty tissue, muscle, and tongue, and opened the airway just superior to the hyoid bone. He opined that the stab and cut wounds could have killed Chavez.

Stash further testified that Chavez suffered a fractured mandible, multiple teeth fractures, a broken nose, fracture to the orbital bones of the eyes, a laceration at the top of the forehead, multiple fractures to the frontal skull, hemorrhages, and contusions to the brain. He explained that the skull fractures were caused by high-impact blunt force that could not be caused by fists or knees. In Stash's opinion, the multiple blunt force impacts to the head were potentially fatal and both the blunt force impacts and the stab and cut wounds could have been fatal either by themselves or together.

Stash concluded that Chavez's death was caused by blunt force head trauma and sharp force injuries to the neck and that a bat like the one purchased by Garcia could be a deadly weapon

13

and could cause the injuries suffered by Chavez. Finally, Stash testified that he did not find any abrasions, contusions, or lacerations on Chavez's arms.

Garcia was the only witness in his defense. He denied killing Chavez and setting up the Monica Facebook page or putting photographs of Monica on his telephone. He suspected that Pricilla set up the Facebook page and claimed that Pricilla used his telephone on a regular basis. He testified that he had dated Pricilla two or three years before the trial and had continued to have sex with her. He denied being in love with her or being jealous of her in December 2013.

Garcia testified that he had received a message with the password to the Monica Facebook page on the night of December 22 and that he looked on her page and found a message from Chavez saying he wanted to rape Garcia's sister. Garcia acknowledged that he sent a message to confirm that Chavez was planning to meet Monica and that it was his intention to confront Chavez about his threat against Perla. Garcia also admitted purchasing the baseball, bat, and gloves at Walmart later that evening. However, he claimed that he intended to give the ball and bat to a boy living at his mother's house and to give one pair of the gloves to his friend, Adame.

Garcia claimed that he wanted to confront Chavez, but had no intention of killing him. He explained that he took the bat out of its package because he thought Chavez might have a gun. Garcia said that when Chavez arrived at the mobile home park, he went over to Chavez's car and asked him why he had threatened his sister. Chavez began cursing him, and they started arguing and pushing each other. He claimed that Chavez made a motion like he had a weapon and that in response, he grabbed the bat and hit Chavez on the arms and back. He denied ever hitting Chavez on the head.

14

According to Garcia, a red Mustang passed by as he and Chavez were fighting. Chavez got a scared expression, was trying to hide from the car, and started texting somebody on his telephone. Chavez mentioned someone named "Carlos," said, "I got to go, I got to go," got in his car, and drove over to the dumpster. Garcia asked him what he was doing. Chavez told him it was none of his business and to leave.

When another car passed, Chavez moved his car again, but did not leave. This time, Garcia told Chavez to leave, but Chavez again told him it was none of his business. Garcia claimed that he then hit the ground with the bat trying to scare Chavez, but that the bat broke. Garcia and Chavez then began to push and hit each other. Chavez then allegedly grabbed the glove and threw it and the piece of the bat to the side.

According to Garcia, they continued to wrestle and hit each other, then saw the red Mustang come back. Garcia did not know the men who got out of the car, but Chavez knew them. They started arguing with Chavez about money and a girl. Garcia said one of the men had a knife and said, "We got to finish this." At that point, Garcia told them he did not want to be a part of it, and he left.

Garcia claimed that when he left, Chavez had a little blood on his head from their wrestling, but that he was standing and leaning on the back of his car. Garcia also testified that he had taken off his gloves and left them and the barrel portion of the bat where he and Chavez had been fighting. However, neither the gloves nor the barrel portion of the bat were recovered at the scene.

Garcia admitted he called Perla and told her that Chavez was in heaven, but claimed that he found out about his death from Pricilla. He also admitted that he had told several lies to the

15

police in his custodial statement, including that he found out about Chavez's death from Carlos. He explained that he was afraid that he would be accused of doing something he had not done.

On cross-examination, Garcia admitted that Chavez told him that he was having sex with Pricilla and that that made him angry. He also admitted that he asked Vargas to pretend to be Monica's cousin, but he denied telling him that he had a plan to lure Chavez to the mobile home park. Garcia agreed that a piece of paper that read "T-BALL" which was found under Chavez's head was similar to the packaging surrounding the baseball and baseball bat he had purchased at Walmart. He also agreed that pieces of cellophane that had covered the bat were littered throughout the crime scene. Finally, Garcia admitted that he was wearing the glove when Chavez tore a piece of it off and that this piece was found underneath Chavez's body.

Garcia's custodial statement was also played for the jury. In it, Garcia initially claimed that on the night of December 22, he went to his mother's house around 10:00 p.m. and stayed for about one hour. When he left his mother's house, he went to Walmart in Longview. Garcia claimed that he bought several Christmas gifts, but did not mention the baseball bat and gloves. He also claimed that he returned home after going to Walmart.

After he learned that Perla had told police that he had a baseball bat when he came to her house, Garcia admitted that fact. Garcia stated that he left the bat in his car and that it would either be in his car or at his mother's house. He finally admitted buying the baseball, baseball bat, and one pair of gloves. Although he told different versions of the events, about ninety minutes into the interview Garcia told the detectives a version of the events that was generally consistent with his trial testimony.

16

## C.     Analysis

Garcia argues that the State failed to prove that the murder was committed in Gregg County. However, two of the investigating officers testified that Chavez's body was found at the Whistlestop, and that the Whistlestop was located in Gregg County, Texas. In addition, Reigstad testified that, based on his investigation, the murder took place where the body was found. No testimony was offered to contradict this testimony. We hold that this is sufficient evidence to establish that Chavez was murdered in Gregg County.

Garcia also argues that there is insufficient evidence that he intended to either cause the death of Chavez to or cause him serious bodily injury, or that he struck Chavez in the head causing his death. Intent is usually proven through circumstantial evidence. *See Clay v. State*, 390 S.W.3d 1, 8 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). Intent can be inferred from the defendant's words, acts, and conduct, as well as from the method of committing the offense and the nature of the victim's wounds. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)).

Viewed in the light most favorable to the trial court's judgment, the evidence showed that Garcia was upset with Chavez both because of his alleged threat against Garcia's sister and because Chavez was having sex with Garcia's lover, Pricilla. It also showed that either Garcia or Pricilla created the false Monica Facebook page and that Garcia used that Facebook page to lure Chavez to the mobile home park, where he planned to confront him. On the way to this confrontation, Garcia stopped at Walmart and purchased a baseball bat and gloves, and paper and plastic similar

17

to the packaging for that type baseball bat was found under and near Chavez's body. Perla and Vargas testified that Garcia told them of his plan to lure Chavez to the mobile home park and sought to enlist Vargas' aid. Garcia admitted that he fought with Chavez and that he hit Chavez with the baseball bat. He also admitted that he grew angrier with Chavez when Chavez told him he was having sex with Pricilla.

Additionally, Chavez was brutally beaten with a blunt object that fractured his skull and caused hemorrhaging in his brain, resulting in his death.[7] Stash testified that a baseball bat similar to the one purchased by Garcia could have been used to inflict Chavez's wounds. After the confrontation, the broken barrel of the bat and the gloves Garcia used were taken from the scene, and a reasonable jury could have concluded that Garcia took them when he left in an attempt to hide evidence of the murder. That conclusion would be supported by Perla's testimony that Garcia called her the next day to tell her Chavez was dead and to ask her to get rid of the baseball, the other pair of gloves, and the packaging that he left in his mother's house.

Although Garcia testified that he only used the bat to hit Chavez on the arms, back, and chest, Stash testified that there was no evidence that Chavez had been struck on the arms. Garcia also testified that he never hit Chavez in the head, that he left when the other men arrived, and that Chavez had only minor injuries at that time. However, the jury, as the sole judge of the credibility of the witnesses, could reasonably have chosen not to believe that testimony.

---

[7]Stash testified that both the blunt force trauma and the cut trauma were sufficient to cause the death of Chavez, whether together or individually. "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a) (West 2011).

Based on the evidence, a reasonable jury could have found that Garcia either intentionally or knowingly caused Chavez's death by striking him with a bat, or, with the intent to cause serious bodily injury to Chavez, Garcia committed an act clearly dangerous to human life that caused Chavez's death by striking him in the head with a bat. We find that the evidence is legally sufficient to support the jury verdict, and we overrule this point of error.

## II.  Sufficient Evidence Supports the Award of Costs

In his third point of error, Garcia asserts that the trial court erred in assessing court costs even though he is indigent. In its judgment, the trial court assessed $269.00 in court costs against Garcia. That assessment is supported by a certified bill of costs from the district clerk reflecting court costs of $269.00. No charge for attorney fees is included in the certified bill of costs. We have previously held that an indigent defendant may be assessed court costs so long as that assessment does not include attorney fees. *Allen v. State*, 426 S.W.3d 253, 259 (Tex. App.— Texarkana 2013, no pet.). Since the certified bill of costs supports the amount of costs assessed, we hold that there is sufficient evidence to support the trial court's cost assessment. *Id.* We overrule this point of error.

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice


Date Submitted:      July 14, 2016
Date Decided:       November 10, 2016

Do Not Publish

19