

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00105-CR

RAMON JOSE ALVAREZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 30793

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

A Lamar County jury convicted Ramon Jose Alvarez of two counts of intentionally or knowingly causing injury to a child, a first-degree felony, and assessed a sentence of sixty years' imprisonment on each count. *See* TEX. PENAL CODE ANN. § 22.04(e) (Supp.). In his sole point of error on appeal, Alvarez argues that the evidence is legally insufficient to support the jury's verdicts of guilt because there was no evidence that he intentionally or knowingly caused the child to have a serious bodily injury or a serious mental deficiency, impairment, or injury.

We find that the jury's verdicts are supported by legally sufficient evidence. As a result, we affirm the trial court's judgments.

## I. Standard of Review

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*,

214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13).

As applied to this case, "[a] person commits an offense if he intentionally[ or] knowingly . . . by act or intentionally[ or] knowingly . . . by omission, causes to a child . . . (1) serious bodily injury; [or] (2) serious mental deficiency, impairment, or injury." TEX. PENAL CODE ANN. § 22.04(a) (Supp.). "Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson*, 589 S.W.3d at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Here, the State alleged that Alvarez "had assumed care, custody, or control of N.S.," a child who was fourteen years of age or younger. In its first count, the State focused on N.S.'s physical health by alleging that Alvarez "by act or omission, intentionally and knowingly cause[d] serious bodily injury to N.S. . . . by failing to provide adequate food or medical care or by confining her in a van or by

3

prohibiting adequate physical activity." In its second count, the State focused on N.S.'s mental health by alleging that Alvarez "by act or omission, intentionally and knowingly cause[d] serious mental deficiency, impairment, or injury to N.S. . . . by failing to provide adequate food or medical care or by confining her in a van or by prohibiting adequate physical activity."

## II.     The Evidence at Trial

The evidence at trial shows that Alvarez kept N.S.[1] confined to a van for seven years and failed to provide her with proper food and nutrition. That information was not discovered until good Samaritans, Jennifer Bramlett and Tommy Bramlett, attempted to aid Alvarez.

At trial, Jennifer testified that she and her husband, Tommy, received a phone call from their church informing them that a "broken down" van covered with religious writings was parked in a nearby Home Depot parking lot. Because Tommy was a mechanic, he and Jennifer went to Home Depot to offer to repair the broken-down van. They met Alvarez and N.S.'s mother, who owned the van and accepted their help. Tommy determined that the "gas tank needed to be dropped in order to make the repair," but Alvarez and Mother refused to move the vehicle so Tommy could make the repair. Two weeks later, Tommy saw that the van was still in the Home Depot parking lot and offered to have the van towed. Alvarez and Mother agreed, and the van was towed to the Bramletts' home.

Jennifer testified that the van had been at their home for half an hour before she first realized there was a child inside of it. According to Jennifer, who had five children of her own, the child from the van, N.S., was "very tiny," "was extraordinarily pale," and "looked about five

---

[1]We use pseudonyms and initials to protect the identity of the child. *See* TEX. R. APP. P. 9.10(a)(3).

or six years old." Jennifer said that on several occasions when N.S. laughed, Alvarez told N.S. "to shut up." Jennifer said that Alvarez and Mother did not want N.S. around her but that when she spoke with N.S. alone for a brief moment, N.S. told her that she did not know her name or age, had "never had a birthday," and said that "she lived on Top Ramen." Jennifer felt uncomfortable by the way Alvarez spoke with both N.S. and Mother and felt that something was wrong. She called the police.

Jennifer testified that Alvarez and Mother locked themselves in their van when the police arrived and refused to exit. David Whitaker, a detective with the Paris Police Department, returned with a warrant and other detectives. According to Whitaker, Alvarez and Mother initially provided false identification and were resistant to providing information about N.S. Whitaker testified that the condition of N.S.'s eyes "was really concerning" and that she looked six or seven even though she was ten. Whitaker testified that Mother said they had lived in the van for the past seven years. Even so, Whitaker testified that N.S. did not even know Alvarez's name and referred to him as "Knight."

On Whitaker's call, Anita Dake, an investigator for Child Protective Services (CPS), arrived at the scene and testified that when she contacted N.S., the child knew her name but did not wish to speak to her and stayed by her mother's side. Whitaker testified that N.S. "knew about CPS; you didn't talk to CPS," and was uncooperative because "[s]he was told not to talk to people." Dake believed that N.S. was four or five but later learned that she was ten. Dake said that N.S. was "developmentally delayed," and Whitaker testified that "it was very obvious that she didn't have any education at all." According to Dake and Whitaker, it appeared that Alvarez,

5

Mother, and N.S. were living out of the "very cluttered," "hoarding-type atmosphere" in the van, which was packed with male clothing but had only about five outfits of children's clothing, an electric space heater, and "extension cords running everywhere." Dake said "[t]here was minimal amounts" of food in the van, that N.S. was sleeping in "a little box," and "[t]here was a toilet on the inside of the door of the van that still had feces and urine in it." Whitaker took pictures of the small sleeping space N.S. used and the "urine in a bucket," which was "right there beside" the shelf where N.S. slept. Whitaker said that the van had a cooler with lunchmeat, ramen noodles, and a loaf of bread. When Whitaker asked Mother how they provided food for themselves, she answered, "that the Lord will provide." Whitaker arrested Alvarez and Mother for child endangerment.

Based on the conditions of the van, CPS removed N.S. from Alvarez and Mother, took her to a Child Advocacy Center for a forensic interview, and placed her in foster care pending further investigation into Alvarez and Mother.

At trial, N.S. said that she and her mother lived in the van with Alvarez, who "always bossed [them] around." N.S. testified that she was never allowed outside, did not get to play with anything except for Legos, and that Alvarez would beat her when she got in trouble "[f]or nothing." N.S. said that she slept on the floor of the van and was often hungry. She said that she had Cheerios without milk for breakfast, and half a pack of uncooked ramen noodles and a small peanut butter and jelly sandwich for lunch, while Alvarez and Mother ate "[a]nything they wanted to" and would not share their food with her. N.S. said that she never had fruit or vegetables and that she once got into trouble for eating a half a loaf of bread for dinner and was

6

not allowed to eat breakfast the next day. N.S. testified that she hated Alvarez, who made her call him "dad" even though she knew he was not her father, and that she was "sad" for her mother.

Catherine Barnett, N.S.'s foster mother, testified that she "was shocked" to learn that N.S. was ten years old "because she was the same size as [her] toddler." According to Barnett, N.S. was malnourished, "very thin and frail, very weak," "had a vision problem" that caused her to run into doors, and did not have the strength to run and play outside because her feet would hurt. Barnett said that N.S. could not walk appropriately and had to be carried. N.S. testified that she felt weak and sick when she first started playing outside and that her whole body would hurt. As a result, N.S. underwent occupational therapy for "two or three months" before she started to build any endurance or stamina to walk. Barnett also testified that N.S. had to be caught up on routine childhood vaccines and had never been to the dentist.

Barnett took N.S. to Melanie Reese, a pediatric nurse practitioner, who testified that N.S. was underweight and that growth charts showed she "was about the size of a four-year-old" and "was below the [first] percentile in everything." Reese explained that malnutrition and being confined to small spaces without physical activity could stunt growth, endurance, and stamina. Reese testified that she believed N.S. "had not been well nourished for most of her life based on her growth," and that N.S. "was behind on her gross motor skills," like using her "arms and legs, walking, running," was weak, and had difficulty walking. Reese also diagnosed N.S. with strabismus, or "wandering eyes," which required medical treatment to prevent further vision

7

issues and loss of eyesight, but said that N.S.'s bloodwork was "surprisingly . . . normal," although she recognized that someone who is malnourished could have normal bloodwork.

N.S. also said that she never went to school when she lived in the van. Barnett enrolled N.S. in school but testified that it was a struggle for N.S. because she could not walk with her classmates without being carried, could not read or write, and was much smaller than her classmates. Barnett said that, as a result, N.S. was placed in special education. To learn to walk appropriately, N.S. was placed in occupational therapy to build strength and her motor skills, which test results showed were at a three-to-six-year-old level.

Barnett testified that N.S. was diagnosed with post-traumatic stress disorder (PTSD) and anxiety and required regular counseling with Lauren Ty Boatman, a licensed professional counselor. Kevin Weatherly, the licensed psychologist who diagnosed N.S., testified that her life in the van caused her PTSD, which was a serious mental impairment or deficiency that was "generally managed," not cured.

Weatherly's report shows that N.S.'s history showed she was forced to hide inside of the van when Alvarez and Mother left it to interact with others. Boatman testified that N.S. had experienced trauma and neglect, "had been talked down to very badly[,] . . . thought very poorly of herself," and "was always so worried that she was going to get in trouble." Boatman's notes reflect that N.S. said Alvarez called her "dumb or stupid," "he was always mean and would yell," and that she feared him and did not feel safe. Boatman testified that N.S. had "adjustment disorder," and Barnett said that N.S. did not know how to socialize appropriately, did not have a concept of personal space, and appeared more interested in toddler toys instead of Barbies,

8

drawing, or coloring. According to Barnett, N.S. hid canned food in her room as if she was worried that she would not have enough to eat and had to be taught how to use a fork, bathe, and brush her teeth and hair. Barnett said N.S. had no "basic hygiene skills" and "[i]t was like [N.S.] and [her] toddler were learning together." Barnett also said N.S. did not "know what it was like to sleep in a bed," and wanted to sleep under the bed because it was how she slept in the van. Even so, Barnett testified that N.S. had an "amazing" transformation in the six months that she was placed in her care.

After hearing that evidence, the jury convicted Alvarez of two counts of injury to a child.

## III. The Jury's Verdicts Are Supported by Legally Sufficient Evidence

In this case, there is ample evidence to support a rational inference that Alvarez malnourished N.S., kept her confined in a van for seven years, prohibited her physical activity, and failed to provide her medical care for the effects of her malnourishment, lack of motor skills due to the confinement, and strabismus. Even so, in his sole point of error on appeal, Alvarez argues that while he "placed N.S. in less-than-favorable living conditions and fed her low-nutritious food, . . . that standing alone fails to prove he had the intent to cause N.S. serious bodily harm or a serious mental deficiency, injury, or impairment." We disagree.

As for count one, a bodily injury can be "serious" if it causes "protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Supp.). "There is no bright-line rule for determining whether an injury constitutes a protracted loss, but there must be evidence that the victim lost use of the limb or that the victim's function was impaired, as well as evidence of how long the use was lost or impaired."

9

*Mathison v. State*, No. 11-12-00052-CR, 2014 WL 887282, at *5 (Tex. App.—Eastland Feb. 27, 2014, no pet.) (mem. op., not designate for publication) (citing *Black v. State*, 637 S.W.2d 923, 926 (Tex. Crim. App. [Panel Op.] 1982)). "Whether an injury constitutes serious bodily injury is determined on a case-by-case basis." *Wade v. State*, 663 S.W.3d 175, 184 (Tex. Crim. App. 2022). "We consider the extent of the injury at the time it was inflicted, not after the effects have been ameliorated by medical treatment." *Bleimeyer v. State*, 616 S.W.3d 234, 241 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (citing *Blea v. State*, 483 S.W.3d 29, 34–35 (Tex. Crim. App. 2016); *Miller v. State*, 312 S.W.3d 209, 213 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd)).

The State showed that N.S.'s growth was stunted by malnourishment and demonstrated a protracted impairment of N.S.'s limbs by the fact that she could not use her arms or legs in a normal manner and could not walk. *See Williams v. State*, 575 S.W.2d 30, 33 (Tex. Crim. App. [Panel Op.] 1979) (concluding that a victim's loss of "lifting power in his arm for three months constitutes a 'protracted impairment . . . of the function of any bodily member'"). N.S. also had protracted impairment of her eyes due to strabismus, which Barnett said caused N.S. to have vision problems and run into doors.

As for count two, "[t]he meanings of 'serious,' 'mental,' and 'injury' are . . . obvious." *Edwards v. State*, 666 S.W.3d 571, 575 (Tex. Crim. App. 2023). "The term 'deficiency' by itself means 'the quality or state of being deficient,' which in turn means 'lacking in some necessary quality or element,' or 'not up to a normal standard or complement.'" *Id.* (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020)). "'Impairment' means 'diminishment or loss of function or ability.'" *Id.* (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th

10

ed. 2020)). "Webster's Collegiate Dictionary also defines the phrase 'mental deficiency' as 'a deficiency in cognitive functioning, *specifically*, intellectual disability.'" *Id.* (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020)). Here, the jury also heard that Alvarez's mistreatment of N.S. caused her PTSD, which Weatherly testified was a serious mental impairment or deficiency that was "generally managed," not cured. In light of the testimony presented, the "PTSD resulting from the trauma of . . . abuse" constituted "a serious mental deficiency, impairment, or injury." *See Ortiz v. State*, No. 02-24-00049-CR, 2025 WL 2458618, at *8 (Tex. App.—Fort Worth Aug. 26, 2025, pet. ref'd) (mem. op., not designated for publication) (citing *Stuhler v. State*, 218 S.W.3d 706, 712–13, 719 (Tex. Crim. App. 2007) ("agreeing with appellate court that 'evidence was sufficient to establish serious mental injury' when State presented expert testimony from therapist who diagnosed child victim with PTSD and lay witness testimony describing child's behavior after appellant's abuse"); *Franco v. State*, No. 13-14-00108-CR, 2016 WL 3389967, at *6, *7 (Tex. App.—Corpus Christi–Edinburg June 16, 2016, no pet.) (mem. op., not designated for publication) ("concluding rational factfinder could have found that child victim suffered from PTSD resulting from appellant's 'denying [him] access to adequate food . . . [and] restroom facilities . . . [,] forcing [him] to stand for long periods of time, . . . and . . . striking [him] with a . . . belt' and that the child's 'mental deficiency, impairment[,] or injury was caused by appellant'" (alterations in original)); *Edwards*, 666 S.W.3d at 577 ("noting that in *Stuhler* and *Franco*, the State presented testimony 'about the connection between the trauma suffered and the present PTSD diagnosis' and concluding that, in

those cases, 'the evidentiary link proving that the physical abuse caused serious mental deficiency, impairment, or injury to the child[]victim was established'" (alteration in original))).

Because the evidence shows serious bodily and mental deficiency, injury, or impairment, Alvarez mainly challenges the element of intent. Injury to a child is "a result-oriented offense." *Cockrell v. State*, 721 S.W.3d 448, 454 (Tex. Crim. App. 2025) (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "This means that proving a violation of the statute requires evidence that the accused possessed a mental state that relates to '*the result* of that conduct[,]' rather than simply to the conduct itself (or in this case, the lack of conduct)." *Id.* (alteration in original) (quoting *Williams*, 235 S.W.3d at 750).

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

"Intent and knowledge are fact questions for the jury and are almost always proven through circumstantial evidence." *Clay v. State*, 390 S.W.3d 1, 8 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). "Intent can be inferred" "from the extent of the injuries" to the victim, the method used to produce the injuries, "and the relative size and strength of the parties." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). It can "also be inferred from circumstantial evidence, such as acts, words," and appellant's conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Also, a

jury is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.–Houston [14th Dist.] 2006, pet. ref'd).

Here, we find the evidence was legally sufficient to establish, at a minimum, that Alvarez was aware that his conduct was reasonably certain to cause N.S. serious bodily injury. The evidence shows that Alvarez was in control of the van and the life lived by N.S. From the evidence, the jury could find that Alvarez chronically malnourished N.S., whose size and appearance shows that she was more like a four-to-six-year-old than a ten-year-old. The evidence shows that N.S. was hungry and asked for food, which Alvarez denied her while he ate whatever he wanted. N.S. weighed only forty pounds, placing her under the one-percentile mark for children her age. Witnesses described her appearance as shocking. Alvarez restricted N.S. to the van and prevented her movement, which debilitated her limbs so she could not use them appropriately. Since Alvarez lived in the van with N.S. for seven years, the jury could infer that he was well-aware of her stunted growth, developmental delays, and lack of motor functions, as well as her visible strabismus, but still failed to feed her appropriately or give her medical care. The jury could find that Alvarez was aware that his acts and omissions were reasonably certain to stunt N.S.'s growth and development since he watched N.S. stop growing and developing. It also could infer that Alvarez knew that anyone who saw N.S. would be concerned about her medical condition because he prevented her from going outside so that no one would see her and told her not to talk to others or to CPS. Further, evidence that Alvarez refused to exit the van when police officers arrived to the Bramletts' home, was hesitant to discuss N.S., and provided

13

false identification to police shows that he had the requisite intent. *See Guevara*, 152 S.W.3d at 50. As a result, we find that legally sufficient evidence supported the jury's verdict of guilt on count one. *See Bleimeyer*, 616 S.W.3d at 247 (citing *Proo v. State*, 587 S.W.3d 789, 810–13 (Tex. App.—San Antonio 2019, pet. ref'd) ("five-year-old child who weighed thirty-eight pounds was severely and obviously emaciated and malnourished, such that defendant-babysitter would have noticed the obvious and apparent emaciation, supporting jury's finding that defendant knowingly caused serious bodily injury by omission; noting that photographs of the child provided 'strong evidence' refuting the defendant's claim that she did not know the child needed medical attention or lacked adequate nourishment; 'Eyewitness testimony concerning a child's appearance can provide evidence of the extent of a defendant's awareness and knowledge of the child's condition and need for medical care.'")).

We also find that the evidence was legally sufficient to establish that Alvarez was aware that his conduct was reasonably certain to cause serious mental deficiency, impairment, or injury to N.S. N.S. hated Alvarez, who was mean and beat her. Alvarez made her call him "Knight" or "dad," even though he was not her father, malnourished her, and punished her for eating by restricting her already-minimal food intake. He denied her any social interaction or schooling, confined her to a van for seven years, which physically debilitated her, and did not let her go outside to walk, run, or play. He made her live in deplorable conditions and made her sleep next to a bucket of urine. When she laughed, he told her to shut up. He called her dumb and stupid and made her feel unsafe. It is hard to imagine treating an animal in this manner, much less a child. We find that that evidence, along with Alvarez's evidence of concealment of N.S., was

14

sufficient to establish that he was aware that his conduct would cause serious mental impairment like PTSD. *See Franco,* 2016 WL 3389967, at \*7.

Because we find that legally sufficient evidence supported Alvarez's convictions, we overrule his sole point of error.

## IV.      Conclusion

We affirm the trial court's judgments.


Charles van Cleef
Justice

Date Submitted:      January 23, 2026
Date Decided:        January 26, 2026

Do Not Publish